FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2014 NOV 10 AM 9: 26



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of )<br><br>D.M.G.,<br>DOB: 5/28/13,<br><br>Minor Child.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>Respondent,<br><br>v.<br><br>DAVID DORSCH,<br><br>Appellant. | No. 71600-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: November 10, 2014 |

BECKER, J. — David Dorsch appeals from the trial court order finding his daughter D.G. dependent. He contends that the trial court's decision rests on inadmissible hearsay. Because substantial admissible evidence supports the court's dependency determination, we affirm.

## FACTS

Carrie Galbreath and David Dorsch are the parents of a daughter, D.G., who was born on May 28, 2013. D.G. was eight months old at the time of the dependency fact-finding hearing in January 2014.

At birth, D.G. tested positive for marijuana, methadone, PCP, and benzodiazepines. She remained hospitalized while doctors treated her with morphine for significant withdrawal symptoms. The Department of Social and Health Services filed a dependency petition on June 25, 2013. Galbreath eventually entered into an agreed order of dependency and is not a party on appeal.

D.G. was released from the hospital on June 26, 2013, and admitted into the Pediatric Interim Care Center, where she remained until September 26, 2013. The center is a highly structured facility, and D.G.'s treatment needs included a low stimulus environment. After leaving the center, D.G. moved with Galbreath to Genesis House, an in-patient treatment facility.

Dorsch did not personally appear for the dependency fact-finding hearing, which began on January 21, 2014. David Norman, the Court Appointed Special Advocate, made several unsuccessful efforts to locate Dorsch before the hearing. Dorsch's two telephone numbers were no longer valid. Norman went to Dorsch's residence and learned that Dorsch no longer lived there. Norman also determined that Dorsch no longer worked at his last known place of employment.

Dorsch has a substantial history of violent and aggressive criminal behavior arising from substance and alcohol abuse. Since 2002, his criminal history includes convictions for driving under the influence and possession of a controlled substance, as well as a domestic violence assault conviction and two

domestic violence no contact orders. Dorsch's most recent conviction occurred in 2011.

Melissa McOmber, a Department social worker, testified that she had contact with Dorsch multiple times over the course of several months. On at least two occasions, McOmber observed Galbreath and Dorsch together. Galbreath appeared "fearful" and "very much reserved" when Dorsch was nearby. McOmber was also aware that Galbreath had accused Dorsch of domestic violence.

McOmber was concerned by several aspects of Dorsch's behavior. During meetings, Dorsch would repeatedly make the same requests, even though he had been told "no." When McOmber once again denied the same request, Dorsch would occasionally leave or become upset or nonresponsive. On several occasions, Dorsch became upset when McOmber was unable to meet with him immediately, even though he did not have an appointment. Dorsch repeatedly asked to bring two nieces with him when he visited Galbreath at the Pediatric Interim Care Center, even though extended family members were not permitted to visit. McOmber concluded that Dorsch did not seem to understand that the purpose of the policy was to maintain the facility's low stimulus environment necessary for D.G.'s treatment needs.

In June 2013, just before the Department filed its dependency petition, Dorsch's urine tested positive for methamphetamine and alcohol. The dependency court directed Dorsch to submit to twice-weekly urine testing. In the

initial June 2013 tests, Dorsch's urine repeatedly tested positive for alcohol consumption. During July and August, Dorsch submitted several "diluted" samples, which the Department considered to be positive for drug or alcohol use. Dorsch failed to appear for any tests after September 26, 2013. Norman spoke with Dorsch at a court hearing on October 11, 2013. Dorsch claimed that he had quit drinking, but Norman noticed alcohol on Dorsch's breath.

Dorsch visited D.G. 26 times during the three months that she was at the Pediatric Interim Care Center. Carolyn Burke, a social worker at the center, described Dorsch's visits as generally "appropriate" but noted that he was "very high energy" on a couple of occasions and would overwhelm D.G. Although Dorsch seemed receptive when told of D.G.'s need for a low stimulus environment,

> he would say that he understood that he needed to be calm but he would still continue to be loud and hold the baby and be very interactive with [her] at times when we asked him to be calm with her.

Based on her observations of Dorsch's interaction with D.G., Burke concluded that he was unable to "provide the low stimulus environment and the therapeutic techniques without needing to be redirected."

Dorsch also visited D.G. after she moved with Galbreath to Genesis House. By the end of November 2013, however, when Jason Haber became Dorsch's caseworker, Dorsch was no longer participating in services and had stopped visiting D.G. at Genesis House.

4

The trial court found D.G. dependent as to Dorsch under RCW 13.34.030(c) (child has no parent or custodian capable of adequately caring for the child). The court acknowledged that Dorsch had shown a willingness to care for D.G. and demonstrated some positive efforts to bond with her. But based on the evidence of Dorsch's criminal history and violent behavior, history of substance and alcohol abuse, recent inconsistent and incomplete urinalysis, erratic and unreliable behavior, and recent unavailability and lack of any participation in D.G.'s life, the court found that the Department had satisfied its burden of establishing that D.G. was dependent. The court ordered Dorsch to submit to random urinalysis, a drug and alcohol evaluation, a psychological evaluation, and a domestic violence assessment, and to participate in parenting services.

## ANALYSIS

Dorsch contends that the trial court erred in admitting inadmissible hearsay and that the properly admitted evidence failed to support the trial court's dependency determination. In particular, he argues that the trial court improperly overruled hearsay objections to testimony by Melissa McOmber, Carolyn Burke, and David Norman about "concerns" that staff at the Pediatric Interim Care Center had expressed or "indicated" to them about Dorsch's visits with D.G. He also challenges testimony that Galbreath told McOmber she did not want to visit D.G. at the same time as Dorsch and told Jason Haber that Dorsch stopped

5

visiting D.G. at Genesis House in late November 2013. Finally, Dorsch contends the trial court's finding that Galbreath reported she was the victim of Dorsch's domestic violence rests solely on inadmissible hearsay.

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). The trial court sustained Dorsch's hearsay objections repeatedly throughout the fact-finding hearing, appropriately observing that if a witness was "going to move into what other people have told her . . . then that is hearsay. Unless it's being offered for another purpose."

On other occasions, however, the court overruled hearsay objections when a witness testified about what another person had "indicated." For example, the court overruled Dorsch's hearsay objection and permitted McOmber to testify that Galbreath had "indicated to me that she did not want to visit [D.G.] at the same time [as Dorsch]." As Dorsch correctly argues, a witness cannot insulate testimony from a hearsay objection merely by avoiding a direct quotation and "indicating" the substance of an out-of-court statement. See State v. Martinez, 105 Wn. App. 775, 782, 20 P.3d 1062 (2001), overruled on other grounds by State v. Rangel-Reyes, 119 Wn. App. 494, 81 P.3d 157 (2003).

But the Department established the substance of the alleged hearsay evidence through nonhearsay sources, and the unchallenged evidence amply supports the trial court's material findings and dependency determination. Consequently, any error in the admission of the challenged evidence was

harmless. See In re Welfare of X.T., 174 Wn. App. 733, 739, 300 P.3d 824 (2013) (erroneous admission of hearsay not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred).

To establish dependency, the State was required to prove by a preponderance of the evidence that D.G. met one of the statutory definitions of dependency. In re Dependency of Schermer, 161 Wn.2d 927, 942, 169 P.3d 452 (2007). Here, the trial court found D.G. dependent under RCW 13.34.030(6)(c), which requires proof that the child "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development."

The primary purpose of a dependency hearing "is to allow courts to order remedial measures to preserve and mend family ties." In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005). Unlike a parental termination proceeding, a dependency hearing is "'a preliminary, remedial, nonadversary proceeding' that does not permanently deprive a parent of any rights." In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (quoting In re Dependency of A.W., 53 Wn. App. 22, 30, 765 P.2d 307 (1988)), cert. denied, 507 U.S. 927 (1993). Consequently, a dependency under RCW 13.34.030(6)(c)

does not turn on parental "unfitness" in the usual sense. Rather, it allows consideration of both a child's special needs and any limitations or other circumstances which affect a parent's ability to respond to those needs. Under RCW 13.34.030([6])(c), it is unnecessary to find parental misconduct in order to find a child dependent.

Schermer, 161 Wn.2d at 944.

The trial court's determination of dependency is necessarily highly fact specific; there are no specific factors that a court must consider when determining whether the child is dependent under RCW 13.34.030(6)(c). Schermer, 161 Wn.2d at 951-52. The trial court has broad discretion when evaluating all of the evidence. Schermer, 161 Wn.2d at 951-52. When reviewing a challenge to the sufficiency of the evidence, an appellate court determines whether substantial evidence supports the trial court's findings of fact and whether the findings support the conclusions of law. In re Dependency of M.P., 76 Wn. App. 87, 90, 882 P.2d 1180, review denied, 126 Wn.2d 1012 (1995).

Here, the alleged hearsay evidence regarding "concerns" expressed by staff at the Pediatric Interim Care Center was not prejudicial. Carolyn Burke, a caseworker at the center, acknowledged that Dorsch's visits with D.G. were "appropriate" for the most part. But she also described without objection her concern about incidents that she observed when Dorsch became "very high energy" with D.G. and failed to calm down, despite multiple staff requests. In an August 7, 2013, letter to Melissa McOmber, which was admitted without objection as exhibit 27, Burke also described several incidents reflecting Dorsch's "concerning behaviors," including his difficulty in understanding or complying with

facility rules and his occasional inability to modify his behavior to respond appropriately to D.G.'s special needs.

The unchallenged evidence was sufficient to support the trial court's finding that Dorsch's efforts to bond with D.G. were "variable," that his contact with D.G. "had to be redirected on several occasions," and that he had "deficiencies providing for the child's basic needs" while visiting at the Pediatric Interim Care Center, as well as difficulty modulating his own behavior.

Dorsch's hearsay challenge to testimony that Galbreath told Haber that Dorsch stopped visiting D.G. at the end of November and to Galbreath's allegation of domestic violence is also unavailing. Norman testified without objection that Dorsch's last contact with D.G. at Genesis House was on November 24, 2013, and that he was concerned by Dorsch's failure to visit for nearly two months. McOmber testified without objection that she was aware that Galbreath had reported that she was a victim of domestic violence. McOmber also testified that she discussed the report with Dorsch, who called Galbreath "a liar" and told McOmber that she should not believe Galbreath's statements about domestic violence. In summary, unchallenged evidence established that Dorsch stopped visiting D.G. at the end of November 2013 and that Galbreath had reported she was the victim of domestic violence.

Dorsch further contends that the evidence was insufficient to support the trial court's dependency determination. He argues that the evidence of his

9

parental deficiency, criminal history, and substance and alcohol abuse failed to establish a substantial risk of harm to D.G.

The unchallenged findings established that Dorsch has a criminal history from 2002 to 2011 that includes assault convictions associated with substance and alcohol abuse. In early June 2013, Dorsch tested positive for methamphetamines and alcohol. Later that month, the dependency court ordered Dorsch to submit to twice-weekly urinalysis. Dorsch then tested positive for alcohol on several occasions. Although the trial court noted that the testing eventually showed some improvement, Dorsch stopped participating without explanation on September 26, 2013. In October 2013, Dorsch told Norman that he had stopped drinking but appeared to have recently consumed alcohol.

Although Dorsch visited D.G. regularly during the three months she was at the Pediatric Interim Care Center, social workers at the center became concerned by his erratic and unreliable behavior. On several occasions, Dorsch was clearly unable to moderate his behavior to meet D.G.'s special needs in the facility, despite repeated instructions from the staff. Dorsch also demonstrated some difficulty in understanding the nature and purpose of the facility's rules.

Dorsch exhibited similar erratic behavior in his contacts with Department social worker McOmber. He repeatedly made the same requests, even after they were denied. Dorsch was "aggressive" and "adamant" in his requests, and occasionally became upset, frustrated, and nonresponsive.

Finally, Dorsch stopped visiting D.G. nearly two months before the dependency fact-finding hearing. At that point, he "basically . . . refused to participate" in the dependency proceeding. He apparently left his last known residence and place of employment without notifying the Department and effectively became unavailable to parent D.G.

In summary, Dorsch's significant criminal history of violent and aggressive behavior associated with substance and alcohol abuse was undisputed. The results of his recent urinalysis testing were inconsistent, and he failed to complete a full round of testing. During some of his visits with D.G., Dorsch had difficulty modulating his behavior to respond to D.G.'s specific needs without redirection and understanding the facility's rules. On occasion, his behavior became erratic when encountering unexpected or frustrating circumstances. Finally, at the time of the dependency hearing, Dorsch had failed to participate in the proceeding for two months, and he was completely unavailable to provide D.G. with a safe home environment. Viewed together, the foregoing circumstances supported a reasonable inference that Dorsch's inability to meet D.G.'s current needs posed a substantial danger to her physical or psychological development. See Schermer, 161 Wn.2d at 952.

The trial court has broad discretion in evaluating the risk of harm, and a dependency finding under RCW 13.34.030(6)(c) does not require proof of actual harm, "only a 'danger' of harm." Schermer, 161 Wn.2d at 951. Substantial evidence supports the trial court's dependency determination.

11

Dorsch argues that the "enthusiasm for parenting" he demonstrated during his visits at the Pediatric Interim Care Center is a positive trait now that D.G. has left that facility and that his criminal history, which involved a use of alcohol or drugs, is no longer a factor because his last conviction was in 2011. But these contentions involve the weight or persuasiveness of the evidence and are not subject to review on appeal. See State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990) (appellate court defers to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence).

Dorsch also contends that the trial court improperly shifted the burden of proof when it found that "there is no evidentiary support to show [the father] can safely provide care for this child" and that the "evidence does not establish that Mr. Dorsch is able to provide a safe environment and to adequately care for [the] child." Viewed in context, however, these findings reflect only the statutory dependency requirements under RCW 13.34.030(6)(c) and the trial court's reliance on Dorsch's complete unavailability for the past two months as a significant factor in the dependency determination. During its oral decision, the trial court expressly noted that "as all of the parties have acknowledged, it's the State's burden to establish by a preponderance of the evidence that the child is dependent as to the father." The court did not shift the burden to Dorsch to disprove dependency.

12

No. 71600-0-I/13

Affirmed.

_Becker, J._

WE CONCUR:

_Spearman, C.J._          _Appelwick, J._